# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAMON BIRL, | 1:06-CV-01676 LJO GSA HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| CALIFORNIA BOARD OF PAROLE HEARINGS, | |
| Respondent. | |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented in this action by the Federal Defender.

**PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Orange, following his conviction by jury trial on April 24, 1989, of one count of second degree murder in violation of Cal. Penal Code § 187. See Respondent's Answer to Petition (hereinafter "Answer"), Exhibit 1. On October 23, 1989, Petitioner was sentenced to serve an indeterminate term of fifteen years to life in state prison with the possibility of parole. Id. Petitioner's minimum eligible parole date was February 15, 1998. See Answer, Exhibit 2.

On November 15, 2004, Petitioner's fifth parole suitability hearing was held before the California Board of Prison Terms (hereinafter "Board"), now known as the Board of Parole Hearings. See Answer, Exhibit 2. Petitioner participated in the hearing and was represented by counsel. Id. At the conclusion of the hearing, the Board denied parole and deferred rehearing for one year. Id. at 64.

Petitioner then filed a petition for writ of habeas corpus in the California Supreme Court. See Answer, Exhibit 6. It was denied on February 22, 2006, with citation to People v. Duvall, 9 Cal.4th 464, 474 (1995), and In re Rosenkrantz, 29 Cal.4th 616, 658, 683-686 (2002). Id.

Petitioner filed the instant petition for writ of habeas corpus in this Court on November 20, 2006. The petition challenges the 2004 decision of the Board denying parole and presents the following claims[1]: 1) He alleges his due process rights were violated when he was found unsuitable for parole in the absence of evidentiary support in the record and rational connection between its findings and conclusions; 2) He alleges his due process rights were violated when he was denied his right to a neutral, detached and unbiased panel; 3) He claims his due process rights were violated when the panel acted arbitrarily and capriciously in finding him unsuitable; 4) He contends his due process rights were violated by the use of unconstitutionally vague assessment criteria; 5) He claims he was denied parole in violation of the Eighth Amendment prohibition of cruel and unusual punishment; and 6) He alleges the Board's actions are in violation of the separation of powers.

On November 19, 2007, Respondent filed an answer to the petition. Petitioner filed a traverse on December 11, 2007.

## FACTUAL BACKGROUND[2]

In February 1988, Priscilla Roberts lived with her fiancé, Richard Hopking, and her two daughters, Trisha and 16-year-old Rachel C. On February 17, Roberts went to work, taking

---

[1] Petitioner also challenged his 2003 parole hearing; however, the District Court determined the claims related to the 2003 hearing violated the statute of limitations and dismissed them accordingly.

[2] The factual background is derived from the summary of facts as set forth in the appellate opinion of the California Court of Appeal, Fourth Appellate District. See Answer, Exhibit 3.

2

1  Trisha to school. Hopking was at home on vacation and Rachel stayed home claiming to be sick.
2  Roberts received a telephone call from the school indicating Rachel was absent. She called
3  Hopking, who said Rachel was not at home.
4        At that time Laura P. was leaving the school feeling ill. As she was leaving, she
5  encountered Rachel and Ronell Jones. They all went to Los Angeles where they picked up
6  Petitioner, and then went to Rachel's house where they got some sodas and talked in the front
7  yard. At some point, Petitioner took Jones' car to get food and the other three went inside the
8  house.
9        Laura went to use the bathroom, and Rachel and Jones went into Rachel's bedroom.
10  When Petitioner returned, Laura knocked on Rachel's bedroom and she and Jones went outside
11  while Rachel remained inside.
12        About 2:00 p.m., Roberts again called Hopking. She spoke with Rachel and told her she
13  was grounded. Rachel did not seem angry or upset. Within 5 or 10 minutes Rachel came outside,
14  crying loudly and uncontrollably. Rachel told them why she was upset. Laura suggested that
15  Rachel run away. Jones said he would "talk to [Hopking] and take care of everything" and said
16  something about hitting him "upside the head" with a rock.
17        Rachel left in Jones' car for about 15 minutes. During this time the other three stayed on
18  the front lawn and talked. Jones said he liked Hopking's car, wanted its telephone, and
19  mentioned getting the car keys.
20        Rachel returned and she and Laura drove around the neighborhood for about five minutes.
21  She dropped off Laura and drove away. Jones told Laura that while they were gone, he went into
22  the backyard and was going to hit Hopking over the head with a rock, but stopped when Hopking
23  turned around. Jones told Laura he would "take care of [Hopking]"; that he would take him "out
24  of Rachel's hair." Petitioner added, "Yeah, we will take care of it." Laura left in time to babysit
25  at 3:15 p.m.
26        Various neighbors saw the four young people talking the front yard and saw Hopking
27  doing yard work. They saw Rachel crying and being consoled. One saw Hopking shut off his
28  lawnmower and enter the house. Later, she saw Rachel enter Hopking's Cadillac and back it into

the garage. She saw one of the boys put what looked like a stereo and bedding into Jones' car, and saw what looked like a rock being thrown over the Cadillac onto the grass. Later, the neighbors found a gray, granite rock, the size of a softball on the lawn.

At 4:15 p.m., Jones returned Danielle Kennedy's car which he had been driving. Rachel and Petitioner were with him. They also had another car (presumably the Cadillac). Jones showed her a body in the trunk.

When Ms. Roberts returned home from work at about 7:15 p.m., she saw blood on the walls. In the bathroom, the lid to the toilet was missing and the shower door was broken. There was blood in the shower. In the hall she found glass from a broken vase. Two trophies from Rachel's room were missing.

Police eventually found Hopking's Cadillac and his body in Compton. An autopsy revealed he had 25 separate wounds, 19 to the head and 6 to the body. These injuries were consistent with being struck by the marble base of a trophy, a ceramic toilet base, and a rock. He also had two broken ribs. There were injuries on the forearm and wrist consistent with application of a ligature prior to death. The marks were consistent with an electric cord found in the house. Jones had a two-inch cut under his eye and scratches and bleeding on his hands. No injuries were apparent on Petitioner or Rachel.

**DISCUSSION**

I.     Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections pursuant to a state

court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging his underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.

5

at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

As noted above, Petitioner's claims were first presented in a petition for writ of habeas corpus in the California Supreme Court. See Answer, Exhibit 6. The petition was summarily denied on February 22, 2006, with citation to People v. Duvall, 9 Cal.4th 464, 474 (1995), and In re Rosenkrantz, 29 Cal.4th 616, 658, 683-686 (2002). Id. AEDPA's strict standard of review is relaxed when the state court reaches a decision on the merits but provides no reasoning to support its conclusion. Under such circumstances, the federal court must "independently review the record to determine whether the state court clearly erred in its application of Supreme Court law." Brazzel v. Washington, 491 F.3d 976, 981 (9th Cir.2007), *quoting* Pirtle v. Morgan, 313

F.3d 1160, 1167 (9th Cir.2002); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.2000) ("Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.").

II.     Review of Petition

A parole release determination is not subject to all the due process protections of an adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see also Greenholtz v. Inmates of Nebraska Penal and Corr. Complex, 442 U.S. 1, 12 (1979) (explaining that due process is flexible and calls for procedural protections that particular situations demand). "[S]ince the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole board proceeding, an inmate is guaranteed the following process: 1) the inmate must receive advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an "opportunity to be heard," Greenholtz, 442 U.S. at 16; and 3) if the inmate is denied parole, the inmate must be told why "he falls short of qualifying for parole." Id. Petitioner does not dispute that he received these procedural rights.

"In Superintendent, Mass. Correc. Inst. v. Hill, the Supreme Court held that 'revocation of *good time* does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by *some evidence* in the record.' 472 U.S. 445, 454 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128 (9th Cir.2006) (emphasis added). The Ninth Circuit has held that this same standard also extends to parole determinations. Irons v. Carey, 505 F.3d 846, 851 (9th Cir.2007), *quoting* Hill, 472 U.S. at 457 ("We have held that 'the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' or is 'otherwise arbitrary.'"). In assessing "whether a state parole board's suitability

determination was supported by 'some evidence' in a habeas case, our analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state." <u>Irons</u>, 505 F.3d at 851. Here, the Court must look to California law and review the record. In reviewing the record and determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence. <u>Sass</u>, 461 F.3d at 1128.

California law provides that after an inmate has served the minimum term of confinement required by statute, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for" the prisoner. Cal. Penal Code § 3041(b). "[I]f in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison," the prisoner must be found unsuitable and denied parole. Cal. Code Regs. tit. 15, § 2402(a). The Board decides whether a prisoner is too dangerous to be suitable for parole by applying factors it has set forth in the California Code of Regulations.

To determine whether 'some evidence' supports the state court decision, the test is not whether some evidence supports the reasons cited for denying parole, "but whether some evidence indicates a parolee's release unreasonably endangers public safety." <u>In re Lee</u>, 143 Cal.App.4th 1400, 1408 (Cal.Ct.App.2006).

In denying parole in this case, the Board provided several reasons for its decision: 1) The nature and gravity of the commitment offense; 2) A further need for self-help therapy and programming; and 3) The oppositions to suitability by the Orange County District Attorney, Orange County Sheriff, and victim's next of kin. <u>See</u> Answer, Exhibit 2 at 64-65. Petitioner disputes the Board's conclusions and argues that there is no evidence supporting the finding that he currently poses an unreasonable risk of danger to society if released. Review of the Board's decision reveals that the state court decision approving the Board's determination of unsuitability was not unreasonable.

The Board stated the "commitment offense and the manner in which it was carried out

[was] the primary reason for the denial." Id. at 64. The Board determined pursuant to § 2402(c)(1) that the offense was especially heinous, atrocious and cruel. Under § 2402(c)(1)(E), the Board found the motive for the crime was "really trivial" or "inexplicable." See Answer, Exhibit 2 at 65. It was noted that the motive for the offense was never really explained, but the evidence showed the murder was likely committed in response to a minor argument between the victim and his fiancee's daughter in which the daughter was "grounded" due to her absence from school. See Answer, Exhibit 3 at 2-3. Petitioner would characterize his attack as a rescue attempt, but the appellate record, which is presumed correct, completely refutes this. The record shows Petitioner did not hear screams emanating from the house to which he responded by rushing in to stop an attack, as he now claims. Rather, the record shows the daughter emerged from the house crying loudly and uncontrollably, then drove away after talking with Petitioner, his crime partner Jones, and the other female, Laura. Id. at 2-3. Petitioner and Jones stayed in the front lawn and discussed with Laura the manner in which they would attack the victim. In fact, the record shows Petitioner and Jones discussed attacking the victim in the precise manner it was accomplished well before the actual confrontation. They discussed "hitting [the victim] 'upside the head' with a rock" and "'tak[ing] care of everything.'" Id. at 3. Jones told Laura that he would "'take care of [the victim]'"; that "he would take him 'out of Rachel's hair,'" to which Petitioner added, "'Yeah, we will take care of it.'" Id. There were also statements made that Petitioner intended to obtain the victim's car and cell phone. Id. Meanwhile, the victim was in the front yard doing yard work. Id. In light of the record, there was some evidence to conclude the motive was either very trivial or inexplicable.

      Moreover, it is clear that the offense was "particularly egregious" in that "the violence or viciousness of [Petitioner's] crime" was "more than minimally necessary to convict him of the offense for which he is confined." In re Dannenberg, 34 Cal.4th 1061, 1095 (2005), *citing* In re Rosenkrantz, 29 Cal.4th 616, 683 (2002). The record shows Petitioner and his crime partner savagely beat to death a 60-year old senior citizen in his own home. Petitioner and his partner chased the victim through his house and repeatedly struck him in the head, face and upper body with a rock and the marble base of a large trophy. See Answer, Exhibit 2 at 50, 62-63. The victim

sustained 19 lacerations to the head and face, massive fractures to the skull, lacerations to the brain, multiple contusions to the upper extremities and abdomen, and a fractured rib. Id. There were also ligature marks on his forearm and wrist consistent with the use of an electric cord as a ligature prior to death. Id. As noted above, there was also evidence the murder was premeditated. See Answer, Exhibit 3 at 2-3. Certainly, the California Supreme Court did not clearly err in rejecting Petitioner's claim that no evidence supported the Board's determination that the offense was particularly egregious and atrocious.

In addition to the commitment offense itself, the Board found Petitioner needed to continue participation in self-help programs. Id. at 65. As previously noted, the Board must consider "[a]ll relevant, reliable information available" in determining Petitioner's suitability for parole. 15 C.C.R. § 2402(b). The Board must consider Petitioner's "past and present attitude toward the crime" and his "past and present mental state." Id. The Board considered the fact that Petitioner had no prior criminal history before the instant offense, no history of drug or alcohol abuse, no gang affiliations, and a good social history, "and yet this victim was so brutally or murdered in such a brutal fashion that it's very difficult to predict if [Petitioner is] going to commit this kind of crime or any crime in the future." Id. at 66. The Board found Petitioner needed additional self-help programming to "further delve into the causative factors for his participation in this crime." Id. at 65-66. The Board noted Petitioner had not participated in any self-help since the last parole hearing. Id. It noted that self-help programs at the institution were limited; however, the Board recommended Petitioner undertake whatever programs were available, and if none were available, to pursue independent studies and journal his progress. The panel concluded that "until further progress is made, [Petitioner] continues to be unpredictable and a potential threat to others." Id. at 66. In light of these considerations, this Court cannot conclude that the California Supreme Court clearly erred in rejecting Petitioner's claim that the Board did not have some evidence to support its conclusion that Petitioner posed an unpredictable and unreasonable risk of danger to the public if released.

The Board also considered the oppositions of the Orange County District Attorney's Office, Orange County Sheriff's Department, and the victim's next of kin. All three were

strongly opposed to a grant of parole due to the vicious and atrocious nature of the offense and Petitioner's need for self-help. Id. at 65. The Board is bound to consider the statements in opposition pursuant to Cal. Penal Code §§ 3042, 3043, and 15 C.C.R. § 2402(b).

The Board also considered various circumstances demonstrating Petitioner's suitability pursuant to § 2402(d). Petitioner was commended for completing his various vocations in optical technology, forklift operating, and finish sanding. See Answer, Exhibit 2 at 66. The Board further noted that Petitioner had sustained only one form CDC-115 rules violation which was 12 years ago, and a counseling chrono in 1999. Id. at 66-67. He was also commended for his parole plans which "are in order." Id. Finally, the Board noted the psychological report of April 22, 2003, was "essentially supportive of release" in that Petitioner "has certainly grown and matured during the course of his incarceration and that compared to other inmates, his dangerousness is below average. And in terms of the community, probably no more than average." Id. at 67. Nevertheless, the Board found these positive factors, while promising for a possible future grant of parole, did not outweigh its determination that Petitioner remained an unreasonable risk of danger to society if released. The nature and gravity of Petitioner's offense, the need for further self-help programming, and the oppositions by the Orange County District Attorney, Orange County Sheriff, and victim's next of kin were more indicative of a danger to the public if released at present. In light of these factors, the Board's determination that Petitioner continued to pose an unreasonable risk of danger to the public was understandable. This Court cannot conclude that the California Supreme Court clearly erred in denying his petition.

Petitioner contends the Board has relied solely on the immutable circumstances of the underlying offense and his criminal history prior to incarceration. In Biggs v. Terhune, 334 F.3d 910, 916-17 (9th Cir.2003), the Ninth Circuit stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Although a denial of parole initially can be justified by relying on the gravity of the offense, over time, "should [the prisoner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his]

1  offense and prior conduct would raise serious questions involving his liberty interest in parole."
2  Irons v. Carey, 505 F.3d 846, 853 (9th Cir. 2007), citing Biggs, 334 F.3d at 916. Nevertheless, in
3  both Irons and Biggs, the Ninth Circuit upheld the denials of parole based solely on the
4  commitment offense. Here, the offense itself was not the only reason for the Board's denial.
5  Moreover, this Court cannot conclude that the Board's denial of parole has resulted in a due
6  process violation when considering the offense, the evidence of rehabilitation, and the time
7  served to date. As discussed above, the offense was atrocious, the Board reasonably found
8  Petitioner needed to demonstrate further evidence of rehabilitation, and as of the date of the
9  hearing Petitioner had served just over 15 years on a 15-years-to-life sentence.

10  Petitioner's remaining challenges to the Board's decision are also unavailing. He asserts
11  the Board members were not neutral, detached and unbiased. It is true that Petitioner is entitled to
12  a panel that is neutral, detached and free from bias or prejudice. Morrissey v. Brewer, 408 U.S.
13  471, 489 (1972); O'Bremski v. Maass, 915 F.2d 418, 422 (1990). However, Petitioner's claim is
14  completely conclusory. In support of his claim, Petitioner cites to an April 9, 1999, article from
15  the Los Angeles Times regarding parole. See Petition, Exhibit 24. This article is outdated and not
16  relevant to this case as it involved the former governor's position regarding parole. Moreover,
17  there is no evidence that the instant panel was partial or biased. In fact, the record shows the
18  panel considered all relevant information and arrived at conclusions supported by at least some
19  evidence.

20  Petitioner also claims the panel's decision was arbitrary and capricious because
21  Petitioner's crime partner has been granted parole whereas Petitioner has not. This claim is also
22  without merit. There is no evidence to conclude the panel did anything but carefully provide
23  Petitioner with individualized consideration using all relevant information in deciding Petitioner
24  remained an unreasonable risk of danger to the public. That Petitioner's crime partner has been
25  granted parole is irrelevant to Petitioner's case.

26  Petitioner next claims the standard used by the Board as set forth in § 2402 is
27  unconstitutionally vague. Vagueness challenges to statutes not threatening First Amendment
28  interests are examined in light of the facts of the case at hand; the statute is judged on an as-

1  applied basis. Maynard v. Cartwright, 486 U.S. 356, 361 (1988). Thus, the court does not
2  address whether the prohibition is vague or overbroad in its other potential applications. United
3  States v. Hogue, 752 F.2d 1503, 1504 (9th Cir.1985). A criminal sanction is not vague if it
4  provides fair notice of the conduct proscribed. Id. A defendant is deemed to have fair notice of an
5  offense if a reasonable person of ordinary intelligence would understand that his or her conduct is
6  prohibited by the rule in question. Id.
7  　　　　Petitioner's void-for-vagueness argument is not persuasive. Cal.Code Regs. tit. 15,
8  § 2402(c) sets forth the circumstances tending to show unsuitability. The Board cannot merely
9  characterize a murder as heinous and deny parole. The Board must take into consideration all of
10 the factors set forth in § 2402(c)(1) in determining whether the crime was especially heinous,
11 atrocious or cruel. In addition, the Board must find that the offense was "particularly egregious"
12 in that "the violence or viciousness of [Petitioner's] crime" was "more than minimally necessary
13 to convict him of the offense for which he is confined." In re Dannenberg, 34 Cal.4th 1061, 1095
14 (2005), *citing* In re Rosenkrantz, 29 Cal.4th 616, 683 (2002).
15 In Petitioner's case, the panel properly considered the factors set forth in § 2402(c) and
16 determined the crime was particularly egregious.
17 　　　　Petitioner also claims the panel violated his right to be free from cruel and unusual
18 punishment under the Eighth and Fourteenth Amendments when it denied parole without
19 penological justification. However, as discussed above, the panel did demonstrate justification
20 for its decision. It carefully considered all relevant information and concluded Petitioner
21 remained an unpredictable and unreasonable risk of danger if released. Furthermore, as noted by
22 Respondent, a life term for murder is not constitutionally disproportionate. Harris v. Wright, 93
23 F.3d 581, 584 (9th Cir.1996).
24 　　　　Finally, Petitioner contends the governor has violated the separation of powers by
25 effectively rewriting the laws of California. This claim is completely unfounded. Petitioner
26 makes a broad assertion that because the governor appoints individuals who are former law
27 enforcement officials, ipso facto the governor has rewritten California law. Statistics, articles and
28 statements are submitted, but they relate to former gubernatorial administrations and have no

bearing on the instant parole hearing. There is simply no evidence that the current governor instructed the panel in Petitioner's hearing to deny him parole, or that the governor maintains a no-parole policy.

In this case, it is apparent the Board considered all relevant evidence and carefully balanced and assessed the various factors in determining Petitioner continued to pose an unreasonable risk to public safety. The California Supreme Court did not clearly err in rejecting his claims.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The Petition for Writ of Habeas Corpus be DENIED; and
2. The Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the Objections.  The Finding and Recommendation will then be submitted to the District Court for review of the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **June 18, 2008**               /s/ **Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE